HALL (BROWN, Adm'r of Price Administration, Intervener) v. CHALTIS.

No. 41.

Municipal Court of Appeals for the District of Columbia.

March 2, 1943.

---

David London, of Washington, D. C. (Harry W. Jones and Norma G. Zarky, both of Washington, D. C., on the brief), for intervenor.

Mark P. Friedlander, of Washington, D. C., for appellee.

Before RICHARDSON, Chief Judge, and CAYTON and HOOD, Associate Judges.

CAYTON, Associate Judge.

This was an action brought by a consumer against a shopkeeper for $50 because of an alleged violation of a price regulation promulgated by the federal Administrator of Price Control under authority of the Emergency Price Control Act of 1942.[1] These are the facts as they appear from the record and from certain concessions made in open court upon the argu-

---

[1] Chap. 26—2d Session, Public Law 421, 77th Congress, 50 U.S.C.A. Appendix, § 901 et seq.

Note: For a discussion of the background, purposes and legal aspects of the Act, see Aidlin, Constitutionality of

ment of the case: The Administrator of Price Control had in March, 1942 fixed the maximum price for nylon hose of the quality, gauge and denier here involved at $2.50 per pair. That continued to be the ceiling price for such hose until October 22, 1942. On October 20, 1942, at 5:04 p. m. the Price Administrator filed with the Division of the Federal Register a new order known as Maximum Price Regulation No. 95, reducing the maximum price on that type of hose to $1.65 effective October 22, 1942.[2] Presumably the new regulation took effect at 12:01 a. m. on October 22, 1942, or for practical purposes, at the beginning of business hours that day. Plaintiff presented herself at the shop of defendant on October 22 at approximately noon. (Defendant insists it was during the forenoon.) She purchased of defendant a pair of nylon hose of the gauge and denier covered by the order of October 20, and paid therefor the sum of $2.50, or 85 cents more than the new ceiling price. She asked for and was given a receipt. On the following day, October 23, 1942 she filed suit in the Small Claims Branch of the Municipal Court, demanding $50 for the alleged violation. Defendant testified that she had no notice whatever of the new and lower ceiling price and in fact did not receive notice of it until three days after the sale and two days after she had been served with process in the case. She also testified that shortly before that time her father had died and that at the very time she was making the sale her husband was in the shop speaking on the telephone to a doctor concerning certain papers in connection with her father's estate. Her husband corroborated this testimony. After hearing the case in part, the trial judge continued it in order to obtain testimony as to whether the stockings were actually of the grade and quality which fell within the new $1.65 price limit. After the stockings had been examined by an expert of the Office of Price Administration, testimony was offered to the effect that they were in fact of the gauge and denier which had been reduced in price to $1.65 by the order of October 20, 1942. The record is silent as to what method if any had been adopted by the Price Administrator for giving notice of price changes put into effect by his orders.

Upon that showing, the trial judge refused to adopt the plaintiff's contention that she was entitled to $50 and limited her recovery to the sum of 85 cents, representing the actual and admitted amount of the overcharge.

A petition for allowance of appeal was filed with us under the provisions of the Municipal Court Act of April 1, 1942.[3] Because of the importance of the questions involved, we allowed an appeal. We also granted the Price Administrator's application for leave to intervene in accordance with Section 205(d) of the Price Control Act. Plaintiff appeared without counsel and filed no brief. Briefs were filed and oral arguments presented for the Price Administrator and for defendant.

The contention of the Price Administrator is that the trial judge committed error in limiting plaintiff's recovery to the eighty-five cent overcharge because he was without discretion in the matter and was required under the Act to grant judgment for $50. The section (205(e) of the Act upon which he relies is, in its applicable parts, as follows: "If any person selling a commodity violates a regulation, order, or price schedule prescribing a maximum price or maximum prices, the person who buys such commodity for use or consumption other than in the course of trade or business may bring an action either for $50 or for treble the amount by which the consideration exceeded the applicable maximum price, whichever is the greater, plus reasonable attorney's fees and costs as determined by the court * * *."

It will be noted that the section authorizes a person who has been overcharged in violation of a price regulation to *bring an action* either for $50 or for treble the amount by which the consideration exceeded the applicable maximum price." (Italics supplied.) What does this language mean? Did Congress intend that every overcharge, whether intentional or otherwise, must be regarded as a violation? Can it be said that every shopkeeper who makes an overcharge whether in good faith or bad, with or without knowledge (or even an opportunity for knowledge) of a change in a price regulation, must forfeit $50 (or more when treble the overcharge amounts to more)? Does it mean

the 1942 Price Control Act, 30 Cal. Law Review 648 (Sept. 1942).

[2] F. R. Doc. 42-10599. Reported in

Volume 7, Federal Register No. 208, published October 22, 1942.

[3] Public Law 512, 77th Congress, 2d Sess., 56 Stat. 190.

that the courts are completely divested of discretion and must automatically grind out judgments for $50 in every such case? We think not. The statute merely provides that the plaintiff "may bring an action", etc. An "action" is merely a form of suit by which a plaintiff presents to a court for its determination his demand for money.[4] To "bring an action" has a settled, familiar legal, as well as general meaning. It is synonymous with "commencing a suit".[5] It is the means by which the judicial machinery is set in motion. It is but the commencement of the suit—the *first* step by which the judicial machinery is set in motion. It is conclusive of nothing. It constitutes notice to the defendant that he has the right and is required to defend himself against the charge. The plaintiff's claim as well as the defense are then submitted to a court or jury, the facts are weighed and the law considered and there follows a judicial determination of the rights of the parties, and whether the "action" has been sufficiently proven to entitle plaintiff to judgment.

■ The quoted section of the Act is both remedial and punitive: remedial in that it provides the method for collecting an overcharge, merely by way of compensation; and punitive in that it authorizes a plaintiff to claim an additional sum which would not otherwise be recoverable. It is in essence a statutory sanction written into the Act to encourage consumer-actions. Thus it amounts to a penalty without reference to the actual amount of damage[6] and is not different from a forfeiture in money.[7]

■ We think the punitive feature must be strictly construed and cannot be operative against a defendant unless the statute expressly authorizes it.[8] Nor can the lia-bility be established or extended by implication.[9]

Unquestionably Congress could have made the $50 recovery mandatory and could have prescribed that a plaintiff in a situation of this kind would be entitled to treble the amount of the overcharge or $50, whichever amount be greater. In other words Congress by appropriate language could have taken the question of the amount of recovery out of the realm of discretion and fixed it arbitrarily as the amount for which judgment would have to be rendered in every case of violation. It is significant that Congress did no such thing in framing this legislation. It is even more significant that Congress had previously prescribed such mandatory recovery in at least one comparable situation, namely, in the Fair Labor Standards Act of 1938.[10] There Congress provided that any employer violating the provisions enacted by underpaying an employee *"shall be liable* to the employee or employees affected in the amount of [their] unpaid minimum wages, or [their] unpaid overtime compensation, as the case may be, *and in an additional equal amount as liquidated damages."* (Italics supplied.) Section 16(b).

This was a legislative edict prescribing not only how much the plaintiff might claim but precisely what the recovery should be. Congress said that the court was to have only two functions, (1) to determine whether there had been an underpayment and if so how much and (2) to add 100 percent to that amount as the unvarying and unvariable amount of the plaintiff's judgment. The courts have several times construed such language to be mandatory and not discretionary.[11] In one of the cases the rule was tersely stated as follows: "Right

---

4 Peterson v. A. Guthrie & Co., D.C., 3 F.Supp. 136.

5 Goldenberg v. Murphy, 108 U.S. 162, 2 S.Ct. 388, 27 L.Ed. 686.

6 Agudo v. Monterey Co., 13 Cal.2d 285, 89 P.2d 400.

7 Cantlay & Tanzola v. Ingels, 31 Cal. App.2d 553, 88 P.2d 141.

8 Tiffany v. National Bank, 18 Wall. 409, 21 L.Ed. 862, 868. State ex rel. Cline v. Industrial Comm., 136 Ohio St. 33, 23 N.E.2d 636, Dairyman's League v. Brockway, 173 Misc. 183, 18 N.Y.S.2d 551.

9 Elliott v. East Pennsylvania R. Co., 99 U.S. 573, 25 L.Ed. 292, Layport v. Rieder, 37 Cal.App.2d 742, 94 P.2d 96.

Citing Ex parte McNulty, 77 Cal. 164, 19 P. 237, 11 Am.St.Rep. 257; People v. Zimbrolt, 35 Cal.App.2d 745, 91 P.2d 252.

10 Enacted June 25, 1938, c. 676, Sec. 1 et seq., 52 Stat. 1060. 29 U.S.C.A. § 201 et seq.

11 Magann v. Long's Baggage Transfer Co., D.C., 39 F.Supp. 742, Harrison v. Kansas City Ry. Co., 8 Cir., 126 F.2d 422, Reeves v. Howard County Refining Co., D.C., 33 F.Supp. 90, Morgan v. Atlantic C. L. R. Co., D.C., 32 F.Supp. 617, Abroe v. Lindsay Bros. Co., 211 Minn. 136, 300 N.W. 457, 458, Atkocus v. Terker, Mun.Ct., 30 N.Y.S.2d 628, Emerson

to the liquidated damages arises automatically with a finding of unpaid overtime compensation. *Because of the explicit statement by Congress that 'an additional equal amount (shall be allowed) as liquidated damages,' the courts are given no discretion* in deciding whether they should form part of the recovery." (Italics supplied.) Abroe v. Lindsay, cited in footnote.

The language used in the statute under consideration is very different in its practical application. Unlike the Fair Labor Standards Act, this Act in authorizing the filing of consumer-actions merely formulates the manner in which a plaintiff may compute his claim, and the maximum *for which he may sue*. It stops short of saying that the defendant "shall be liable" for the amount claimed. Viewed in a reasonable light, we think it does not mean, as the Price Administrator contends, that every shopkeeper who makes an overcharge of even a few cents must forfeit $50 to every customer who decides to sue. If that were so a small shopkeeper could unwittingly put himself out of business in a few minutes by making a series of small overcharges, however innocent his intentions.

Widespread bankruptcies might easily engulf unwary shopkeepers, large and small, if the contention of the Administrator were adopted as law; for he takes the frank position that every overcharge means a violation and that upon every bare showing of an overcharge, without more, a consumer becomes automatically entitled to the maximum. We do not think Congress intended any such sweeping punitive measure, for it would actually serve to defeat one of the very purposes of the Act which is stated in the preamble, "to prevent hardships to persons engaged in business." Section 1.

Black markets should be suppressed and profiteers punished by every lawful means. On the other hand the innocent should not be swept into court with the guilty and denied an opportunity to present a reasonable defense.

■ In the case before us the new price ceiling was "filed" in the Division of the Federal Register on October 20 at 5:04 p. m., an hour when the business day was virtually over. The order being an "administrative regulation of general applicability" was required to be printed in the Federal Register.[12] The statute provides (sec. 307): "No *document* required * * * to be published in the *Federal Register shall be valid as against any person who has not had actual knowledge thereof*", until it is filed with the Division and a copy "made available for public inspection [in the office of the Director of the Division of the Federal Register]." (Italics supplied.)

It was not actually published until two days later—the exact date of the alleged violation by defendant. The record is silent as to the hour of publication and, it is admitted that defendant had not seen the regulation at the time the sale was made. How the plaintiff knew of the price reduction order before knowledge had come to the shopkeeper is of course only conjecture.

■ We rule that upon the showing before us it cannot be held that $50 must be the inevitable amount of recovery. We decide that under the Price Control Act such a ruling would not be justified. We feel that such a ruling would leave no defense to retailers, however innocent their conduct. They would not, for example, be permitted to show that they had been entrapped by someone who managed to obtain advance notice of a price reduction. They would not be heard to say that the overcharge had been made innocently or without notice or opportunity of notice of the order. They would not be allowed to explain the difficulty of interpreting such an order or determining whether a particular price schedule applied to a particular article of merchandise. (This particular schedule included twenty-seven retail prices for various nylon stockings.) Indeed they would not even be permitted to prove impossibility of performance.[13] In short the door of justice would be firmly closed against any attempt they might make to present a defense and court judgments

---

v. Mary Lincoln Candies, 287 N.Y. 577, 38 N.E.2d 234, Lefevers v. General Export Iron & Metal Co., D.C., 36 F.Supp. 838.

[12] See Federal Register Act, passed July 26, 1935, 44 U.S.C.A. § 301 et seq. Note: For an informative discussion of the use of the Federal Register, see Wigmore, The Federal Register and Code of Federal Regulations, 29 A.B.A. Journal 10—January, 1943.

[13] In Dawson v. Shaw, 28 Pa.Super. 563 physical impossibility of performance was approved as a ground of defense.

would indeed become automatic. Congress has not said that this should be so. We decline to say so by judicial fiat.

■ II. Appellee did not challenge the jurisdiction of the trial court below but has raised the question here. She relies on Title 28 U.S.C.A., Judicial Code, c. 2, sec. 41, sub-paragraph 9, which provides that District Courts of the United States shall have original jurisdiction "of all suits and proceedings for the enforcement of penalties and forfeitures incurred under any law of the United States". Section 205(e) of the Act under consideration provides that "any suit or action under this subsection may be brought *in any court of competent jurisdiction*". (Italics supplied.) We do not think that jurisdiction of such actions is exclusively in the United States District Courts. We rule that in using the words, "any court of competent jurisdiction" Congress authorized any federal *or state court* to take the case if its jurisdiction embraces the amount of the claim. This has been held many times.[14]

■ The Small Claims Branch of the Municipal Court was vested with exclusive jurisdiction of all cases where the amount claimed, exclusive of interest, attorney's fees, protest fees and costs does not exceed $50.[15] It therefore had jurisdiction to entertain the suit.

Affirmed.

HOOD, Associate Judge.

I agree the judgment should be affirmed but believe affirmance should be on the sole ground that the defendant was without notice or reasonable opportunity to acquire notice of the revised price schedule.

As stated in the majority opinion, the revised schedule was filed in the late afternoon of October 20th, to become effective October 22nd. It is conceded the defendant had no actual notice of the new sched-

ule and counsel for the Price Administrator at the argument of the case stated there was no procedure for giving actual notice. In his brief, the Price Administrator states a press release announcing the terms of the new regulation was issued for publication on October 21st, but we are not advised as to whether publication occurred on the 21st or 22nd. Publication in the Federal Register did not occur until the 22nd, and I think we can take judicial notice that the average shopkeeper does not see that publication and probably is unaware that such a publication exists.

While the Emergency Price Control Act does not in terms require notice of a proposed change in schedule of prices, I feel it was the intention of Congress that notice or a reasonable opportunity to acquire notice be afforded storekeepers before they become subject to the penalty provisions of the Act.[1] There is firmly embedded in our conception of justice the principle that no one be subjected to penalties or damages unless he knows or should know that his act will subject him to such. The Emergency Price Control Act itself, it seems to me, recognizes this principle, because the very sub-section of the Act under which the proceeding below was brought provided it should not take effect "until after the expiration of six months from the date of the enactment of this Act."[2] This provision indicates to me that Congress intended to give the people time and opportunity to learn of the provisions of this new legislation before they became subject to its penalty provisions; and I cannot believe that Congress intended that the Price Administrator might make changes overnight and subject one to penalties who had no notice of the change nor a reasonable time in which to acquire such notice. This belief is confirmed by other recent legislation of a somewhat similar nature. The provisions of the Fair Labor Standards

---

[14] Robertson v. Argus Hosiery Mills, 6 Cir., 121 F.2d 285, certiorari denied 1942, 62 S.Ct. 181, 314 U.S. 681, 86 L.Ed. 544, Consolidated Cos. v. Martin, D.C., 39 F.Supp. 567, Stewart v. Hickman, D.C., 36 F.Supp. 861, Hargrave v. Mid-Continent Pet. Co., D.C., 36 F.Supp. 233, Atkocus v. Terker, supra, Emerson v. Mary Lincoln Candies, supra, Abroe v. Lindsay Bros. & Co., supra, Adair v. Traco Division, 192 Ga. 59, 14 S.E.2d 466, Stringer v. Griffin Grocery Co., Tex., Civ.App., 149 S.W.2d 158, Tapp v. Price-Bass Co., 177 Tenn. 189, 147 S.W.2d 107;

Forsyth v. Central Foundry Co., 1940, 240 Ala. 277, 198 So. 706.

[15] Chap. 43, 3d Session. Public Law No. 441, 75th Congress, 52 Stat. 103, D.C.Code, (1940 Edition) Title 11, sec. 804.

[1] It is the position of the Price Administrator that the section of the Act here involved provides for liquidated damages rather than a penalty but for practical purposes there seems to be little difference.

[2] Sec. 205(e).

Act, fixing minimum wages and maximum hours and giving an employee the right to recover liquidated damages from an employer violating its provisions, provided that the minimum wage and maximum hours provisions should "take effect upon the expiration of one hundred and twenty days from the date of enactment of this Act."[3] The District of Columbia Emergency Rent Act, fixing maximum rent ceilings and minimum service standards and permitting a tenant to bring an action against the landlord violating those provisions, made such provisions effective "on and after the thirtieth day following the enactment of this Act."[4] If Congress deemed it necessary and advisable in the passage of the acts cited to allow a period of time between the dates of the enactment and the effective dates of the provisions of the acts in order that the people have time and opportunity to acquaint themselves with their provisions and thus be enabled to take precautions necessary to prevent their violations and consequent penalties or damages, then it seems to me that Congress must have intended that retailers have a reasonable time to acquaint themselves with the changes in price schedules before they are deemed violators of the changed schedules. The consideration of the acts prior to enactment attracted much public attention and discussion and their passage became known generally almost immediately, but there was not that same public discussion, if indeed any, prior to this particular change of price schedule. As far as we know, there was no occasion for the defendant in this case anticipating this change in price, and I do not feel that she had reasonable time in which to acquire notice of that change.

The Price Administrator seems to have recognized the necessity of giving notice of the change in schedule and adopted as a means Section 1401.6 of the revised price schedule in question, requiring that every person selling nylon hosiery to a purchaser other than an ultimate consumer should, at the time of delivery, furnish written notification to such purchaser that the maximum prices at which such hosiery could be sold had been fixed by the Price Regulation No. 95 of October 20, 1942. This was an effective means of notifying the retailers of the change in prices when they thereafter bought hosiery from a wholesaler or a manufacturer, but, of course, it had no effect in the instant case.

Acts of Congress are to be given a sensible construction,[5] and I think the sensible and reasonable construction of the Emergency Price Control Act requires that no one be held in damages for violation of a revised price schedule pursuant to the Act unless he has notice or a reasonable opportunity to acquire notice of the changed schedule. Any other construction would mean that Congress intended to treat alike those who have no notice or opportunity to acquire notice, those who have opportunity to acquire notice but neglect to do so, and those with notice who deliberately refuse to comply.[6]

It has not been argued, and I do not think anyone would seriously contend, that the defendant in this case had reasonable opportunity to acquire notice of the changed schedule at the time she made the sale in question. For this reason, I am of the opinion there was no violation of the Act, and the judgment below was correct and should be affirmed. If I am correct in my views, it is not necessary that this court consider the other features of the act discussed in the majority opinion.

---

3 29 U.S.C.A. §§ 206, 207.

4 Public Law 327, 77th Congress, 1st Sess., 55 Stat. 788, D.C.Code (1940 Ed., Supplement 1), Tit. 45, Sec. 1602.

5 United States v. Katz, 271 U.S. 354, 357, 46 S.Ct. 513, 70 L.Ed. 986.

6 The Price Administrator argues that because Section 205(b), providing for criminal prosecutions, is limited to those who "wilfully" violate, that the absence of the word "wilfully" in Section 205(e) indicates an intention by Congress that good faith is no defense to an action such as the present one brought under Section 205(e). The act of the defendant in this case was done in complete ignorance of the changed schedule, and, therefore, it seems to me neither good faith nor bad faith could be exercised, that is, that the question of good or bad faith arises only when there is notice or opportunity to acquire notice.